JM:ALB:JRC
F.#2002R01555

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA

   - against -

STEVEN MESZAROS and
BRADFORD HODNETT,

             Defendants.

------------------------------X

# 06   0290M



AFFIDAVIT IN SUPPORT
OF ARREST WARRANTS

(18 U.S.C. § 371)

EASTERN DISTRICT OF NEW YORK, SS:

      J. Randolph Cox, being duly sworn, deposes and says

that he is a Criminal Investigator with the United States

Attorney's Office for the Eastern District of New York, duly

appointed according to law and acting as such.

      Upon information and belief, in or about and between

November 1999 and January 2002, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere,

the defendants STEVEN MESZAROS and BRADFORD HODNETT, together

with others, did knowingly and intentionally conspire to devise a

scheme and artifice to defraud John Doe #1, an individual whose

identity is known to the United States, and to obtain money and

property from John Doe #1 by means of materially false pretenses,

representations and promises and, for the purpose of executing

such scheme and artifice, did transmit and cause to be

transmitted, writings, signals and sounds by means of wire

communication in interstate commerce, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Section 371).

The basis for your deponent's information and the grounds for his belief are as follows:[1]

1.    I am a Criminal Investigator with the United States Attorney's Office for the Eastern District of New York assigned to investigate, among other things, white collar fraud and business crimes. I have been employed as a Criminal Investigator for over four years and prior to that as a Postal Inspector for fourteen years.

2.    Together with agents of the United States Postal Inspection Service, I have been conducting an investigation into a fraudulent scheme devised and implemented by the defendants. The information contained herein is based upon my personal knowledge from conducting this investigation, interviews of witnesses, my review of financial records, review of recorded conversations, information provided to me by other law enforcement agents, and my experience as a federal agent.

---

[1]    Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. Rather, it includes only sufficient facts to meet the showing of probable cause required at this stage of the proceedings.

<u>INTRODUCTION</u>

3.    Nexus Asset Management, L.L.C. ("Nexus") and its
successor, Livestreet, L.L.C. ("Livestreet")(collectively,
"Nexus/Livestreet") were limited liability corporations located
on Franklin Avenue in Garden City, New York, and formed under the
laws of the State of New York.  Nexus/Livestreet provided a
trading location for individuals, commonly referred to as "day
traders."  "Day trading" is a stock trading strategy whereby
stock traders, through a high volume of trading activity, attempt
to profit from slight changes in the prices of securities by
buying and selling securities within a very short period of time.
Typically, day traders both buy and sell a given security within
a single trading day.  Nexus/Livestreet provided day traders with
computer terminals and access that enabled the day traders to
execute their trades.

4.    Defendants MESZAROS and HODNETT were partners in
Nexus/Livestreet and together ran the day-to-day operations of
Nexus/Livestreet, including day trading activities.

5.    Terra Nova Trading, L.L.C. ("Terra Nova"), was a
broker-dealer of securities registered with the U.S. Securities
and Exchange Commission and the National Association of
Securities Dealers, Inc. ("NASD"), which maintained its principal
office in Chicago, Illinois.  Defendant MESZAROS was a stock
broker licensed by the NASD, who executed trades made by the day

4

traders at Nexus/Livestreet through Terra Nova.  The day traders
paid Terra Nova a fee for each completed trade.  Terra Nova then
paid Nexus/Livestreet a portion of these fees on a monthly basis.

THE CONSPIRACY

6.    In or about and between December 1999 and
September 2001, defendants MESZAROS and HODNETT solicited
investment funds for Nexus from John Doe #1.  Defendants MESZAROS
and HODNETT represented to John Doe #1 that his funds would be
pooled with the day traders' own funds, thereby increasing the
day traders' trading power, but that John Doe #1's funds would
not be at risk because defendant MESZAROS would stop the day
traders' trading if their accounts fell below the amount of the
funds each day trader personally invested.  Furthermore, John Doe
#1 was assured by defendants MESZAROS and HODNETT that all the
monies dispersed to day traders would be secured by promissory
notes from the day traders to John Doe #1.

7. In or about November 1999, at the direction of
defendant MESZAROS, John Doe #1 opened an account at Terra Nova.
In or about December 1999, John Doe #1 deposited cash and
transferred securities into this Terra Nova account.

8. On or about December 15, 1999, defendant MESZAROS
instructed John Doe #1 to sign two blank Terra Nova Account
Transfer Request forms, both of which were blank except for the
name and account number of John Doe #1.  John Doe #1 and the

5

defendant MESZAROS agreed that these blank forms were for transactions that would occur on that the same day.  I have reviewed Terra Nova Statements and original Account Transfer Requests which reveal that on this same date, funds totaling approximately $275,000 were transferred from John Doe #1's Terra Nova account to the Terra Nova accounts of several Nexus day traders.

9.    In or about and between February 17, 2000 and June 7, 2000, John Doe #1 also gave defendants MESZAROS and HODNETT three checks, totaling approximately $903,000, for deposit into his Terra Nova Account. Defendants MESZAROS and HODNETT then caused additional transfers from John Doe #1's account to be made to the accounts of Nexus day traders.  The total amount of these transfers exceeded $1,000,000.  Defendants MESZAROS and HODNETT continued to represent to John Doe #1 that his funds would not be at risk and that all the monies used to increase trading power of the day traders would be secured by promissory notes.

10.   I have interviewed Confidential Source #1 ("CS-1") and Confidential Source #2 ("CS-2"), individuals whose identities are known to the United States.  CS-1 and CS-2 were day traders at Nexus/Livestreet and in addition both were employed by defendants MESZAROS and HODNETT to perform various administrative and financial duties for Nexus/Livestreet.

11.   CS-1 and CS-2 have admitted that despite the

representations made to John Doe #1, beginning in or about
December 1999, promissory notes were not secured for all the
funds loaned to day traders. CS-1 and CS-2 also stated that
within a few months much of this money was lost as a result of
trading losses incurred by the day traders.  CS-1 and CS-2
admitted they also lost money day trading but were allowed by
defendants MESZAROS and HODNETT to continue to trade and
ultimately lose funds loaned by John Doe #1.  According to CS-1,
defendant MESZAROS, as the registered representative of Terra
Nova, was prohibited from trading and therefore used CS-1's
account to execute day trades of his own using monies provided by
John Doe #1.   According to CS-1 and CS-2, defendants MESZAROS
and HODNETT did not inform John Doe #1 of the trading losses by
the day traders.

          12.  In or about late 2000, defendants MESZAROS and
HODNETT made representations to John Doe #2, an individual whose
identity is know to the United States, in connection with John
Doe #2's contemplation of investing in their day trading
business.  John Doe #2 was a friend of John Doe #1.  Defendants
MESZAROS and HODNETT provided John Doe #2 with false reports that
showed the money John Doe #1 had provided was secure and all the
day traders had balances in their accounts exceeding the amount
borrowed. The defendants MESZAROS and HODNETT repeatedly told him
that the day traders were very good, the day traders were

profiting and some had made hundreds of thousands of dollars. Defendants MESZAROS and HODNETT concealed the fact that day traders had lost their own monies as well as monies borrowed from John Doe #1.

13.   Defendants MESZAROS and HODNETT represented to John Doe #2 that day traders who borrowed money from John Doe #1 executed promissory notes for the money borrowed from John Doe #1. Defendant MESZAROS also told John Doe #2 that he had instantaneous access to all the day trader's accounts and therefore could stop a day trader from trading.  This was an additional assurance to demonstrate that John Doe #1's money was never at risk.

14.   I have reviewed two spreadsheets, one titled "Cash Position June 2000" and the other "Cash Position July 2000", provided to John Doe #2 by defendants MESZAROS and HODNETT prior to John Doe #2's investment.  These spreadsheets list the amount of John Doe #1's money that was borrowed and the current balance or equity in each day trader's account.  Both spreadsheets contain materially false information; specifically, the June 2000 spreadsheet states that the day traders had borrowed a combined total of approximately $797,000 and those same day traders had a combined total of approximately $1,080,000 in their accounts.  In fact, an examination of Terra Nova account records shows that the actual combined total of monies in the day traders' accounts, as

of June 30, 2000, was approximately $576,000. Similarly, the July 2000 spreadsheet falsely inflates the day traders combined account balances by approximately $500,000. Thus, these false reports concealed the fact that over $200,000 of John Doe #1's money had already been dissipated through trading losses and account withdrawals.

15. On or about January 1, 2001, John Doe #2 entered into a written agreement to purchase a 51% ownership in Nexus, under the new name Livestreet from defendants MESZAROS and HODNETT for payments of $150,000 each to defendants MESZAROS and HODNETT. John Doe #2 invested $150,000 of his own money and borrowed $150,000 from John Doe #1 to invest.

16. After investing in Nexus/Livestreet, John Doe #2 requested daily reports so that he could monitor how the business was doing and ensure that the money invested by John Doe #1 was not at risk. According to CS-1 and CS-2, defendants MESZAROS and HODNETT did not inform either John Doe #1 or John Doe #2 of the trading losses by the day traders. Instead, defendants MESZAROS and HODNETT, along with CS-1 and CS-2, prepared fictitious financial statements ("Morning Reports") that falsely stated that the day traders at Nexus/Livestreet maintained adequate balances in their individual Terra Nova accounts to cover the funds lent by John Doe #1. These false Morning Reports, dated in or about and between March 2001 and October 2001, were shown to John Doe

#2 and John Doe #1.  These false reports were also transmitted by facsimile from Garden City, New York, to Florida, where they were reviewed by an individual overseeing John Doe #1's account.

17. CS-1 and CS-2 stated that they both met with defendants MESZAROS and HODNETT and discussed with them the continued use of these false reports to conceal from John Doe #1 the trading losses of John Doe #1's funds.

18.  On or about April 2, 2001, defendants MESZAROS and HODNETT solicited and received additional funds via a wire transfer of $300,000 from John Doe #1.  Defendants MESZAROS and HODNETT again represented that these funds would not be at risk as per the terms of their original agreement and that promissory notes would be executed by the borrowing day traders.  According to CS-1 and CS-2, as well as Terra Nova records, within a few months, much of this money was lost as a result of trading losses incurred by the day traders.

19.  In or about and between July and August 2001, defendants MESZAROS and HODNETT negotiated an agreement whereby they would repurchase John Doe #2's interest in Livestreet for $300,000.  As part of this buy-out, John Doe #2 agreed to accept $150,000 and was told by the defendant MESZAROS that the remaining $150,000 would be paid directly to John Doe #1 in order to repay the $150,000 John Doe #2 had borrowed from John Doe #1 for his initial investment.

20.   In or about July 2001, defendants MESZAROS and HODNETT represented to John Doe #1 that they were seeking to buy-out the interest of John Doe #2 and they solicited an additional $150,000 from John Doe #1 for this purpose.   Thereafter, on or about July 27, 2001, John Doe #1 mailed a check, payable to "Steve Meszaros", in the amount of $150,000.   This check was deposited into the Livestreet bank account at JP Morgan Chase.

21.   On or about August 31, 2001, defendants MESZAROS and HODNETT executed a written agreement whereby Livestreet would repurchase John Doe #2's interest in Livestreet effectively terminating the business relationship.   Defendants MESZAROS and HODNETT agreed to pay John Doe #2 $150,000, subsequently made two payments to John Doe #2, totaling $95,000, but never paid him the balance due.   Similarly, defendants MESZAROS and HODNETT never paid $150,000 to John Doe #1 as repayment for the investment monies borrowed by John Doe #2.

22.   I have also spoken with Day Trader #1, an individual known to the United States, who informed me that he lost his own funds day trading at Nexus/Livestreet.   In or about September 2000, at the suggestion of defendant MESZAROS, he/she borrowed funds that he understood were provided by John Doe #1. At the direction of defendants MESZAROS and HODNETT Day Trader #1 also executed a promissory note, payable to John Doe #1, in the amount of $80,000.

23.   Day Trader #1 continued to lose the money, closed his Terra Nova account in or about March 2001 and told defendants MESZAROS and HODNETT that he wanted to settle the debt owed to John Doe #1.  Day Trader #1 was directed to write a check payable to "BRADFORD HODNETT," in the amount of $80,000 to settle the debt owed to John Doe #1.  In exchange for this payment, the original promissory note payable to John Doe #1 was marked paid in full and given to Day Trader #1.

24.   A review of bank records shows that this $80,000 check, dated March 6, 2001, was endorsed and deposited into a Citibank account in the name of defendant HODNETT. The memo section of the check reads, "To Repay Nexus Loan in Full."

25.   After Day Trader #1 closed his account, defendant MESZAROS told Day Trader #1 that Day Trader #1 could continue to trade in the "house account" without investing any additional funds.  Defendant MESZAROS further explained to Day Trader #1, that MESZAROS and CS-1 also traded in the house account.

26.   I have also spoken to Day Trader #2, an individual known to the United States.  Day Trader #2 indicated that he had initially day traded with his own funds at Nexus/Livestreet and lost money.  In or about February 2000, at the suggestion of defendant MESZAROS, Day Trader #2 borrowed $60,000 of John Doe #1's funds.  Subsequently, at the direction of defendants MESZAROS and HODNETT, Day Trader #2 executed a promissory note

payable to John Doe #1. Day Trader #2 was told by defendant MESZAROS that he could continue to trade with the money borrowed from John Doe #1, but that half of any profits realized with this money would be split with defendant MESZAROS. Day Trader #2 informed me he periodically was allowed to borrow additional money from John Doe #1 by defendants MESZAROS and HODNETT, and that he was not required to execute promissory notes for these additional funds, totaling approximately $125,000.

27. In or about December 2001, John Doe #1 became aware that he had been defrauded and approximately $1,700,000 of the money he invested was gone. He was told by the defendant MESZAROS there was virtually no money left in day traders Terra Nova Accounts. John Doe #1 was also told by the defendant MESZAROS that the day traders' promissory notes had been stolen.

28. In a subsequent recorded telephone conversation the defendant MESZAROS told John Doe #1 that he had engaged in illegal conduct, specifically securities fraud violations, stating that as a broker he could not lend money and also stating, "I'm gonna fry for this, it's so illegal what I've done." However, he claimed others were responsible for the loss

13

of John Doe #1's money, the false Morning Reports and the missing promissory notes.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for defendants STEVEN MESZAROS and BRADFORD HODNETT so that they may be dealt with according to law.

J. Randolph Cox
Criminal Investigator
U.S. Attorney's Office

Sworn to before me this
13 day of Marc' 2006

THE HONORABLE ARLENE R.    .NDSAY
UNITED STATES MAGISTRA'   JUDGE
EASTERN DISTRICT OF NEI  YORK